UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHANNON MAYSTEAD,

                Plaintiff,                                    Hon. Ellen S.  Carmody

v.

                                                    Case No. 1:11-cv-614

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.

_____/

## OPINION

        This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act.  On November 30, 2011, the parties agreed to proceed in this Court for all further proceedings, including an order of final judgment.  (Dkt. #13).

        Section 405(g) limits the Court to a review of the administrative record and provides that if the Commissioner's decision is supported by substantial evidence it shall be conclusive.  The Commissioner has found that Plaintiff is not disabled within the meaning of the Act.  For the reasons stated below, the Court concludes that the Commissioner's decision is not supported by substantial evidence.  Accordingly, the Commissioner's decision is **affirmed**.

1

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial

interference.  *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted).  This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision.  *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 36 years old on the date of the ALJ's decision.  (Tr. 17, 119).  She completed three years of college and worked previously as an assistant manager, waitress, machine operator, and customer service representative.  (Tr. 148, 153, 157-66).

Plaintiff applied for benefits on March 9, 2007, alleging that she had been disabled since December 16, 2005, due to injuries suffered in an automobile accident.  (Tr. 119-26, 147).  Plaintiff's application was denied, after which time she requested a hearing before an Administrative Law Judge (ALJ).  (Tr. 81-118).  On September 23, 2009, Plaintiff appeared before ALJ Timothy Stueve, with testimony being offered by Plaintiff and vocational expert, Michelle Ross.  (Tr. 28-80).  In a written decision dated November 12, 2009, the ALJ determined that Plaintiff was not disabled.  (Tr. 15-23).  The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter.  (Tr. 1-6).  Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## RELEVANT MEDICAL HISTORY

On December 17, 2005, Plaintiff was involved in a single vehicle accident.  (Tr. 266).  A CT scan of Plaintiff's pelvis revealed that she suffered a "minimally displaced fracture involving

3

the right sacral wing anteriorly with no left sided sacral fracture visualized." (Tr. 273). This examination also revealed that Plaintiff's SI joints were "symmetric and intact bilaterally." (Tr. 273). Moreover, Plaintiff's hips were "symmetric and intact with no hip fracture on either side." (Tr. 273). A CT scan of Plaintiff's lumbar spine revealed "mildly displaced fractures involving left sided lumbar transverse processes from L2 through L4." (Tr. 273). This examination also revealed "normal alignment in the lateral plane throughout with normal disc spacing" and "no gross abnormality within the lumbar canal." (Tr. 273). X-rays of Plaintiff's chest were "negative." (Tr. 272). X-rays of Plaintiff's right knee revealed no evidence of fracture, dislocation, or joint space abnormality. (Tr. 275). X-rays of Plaintiff's thoracic spine were "negative" with "normal" alignment and disc space height with "no paraspinal soft tissue widening." (Tr. 277).

On March 8, 2006, Plaintiff participated in a CT scan of her brain the results of which were "normal." (Tr. 296). On September 8, 2006, Plaintiff participated in an MRI examination of her lumbar spine the results of which revealed "mild lumbar degenerative changes without spinal stenosis or root compression evident." (Tr. 311). X-rays of Plaintiff's chest, taken November 14, 2006, were "normal." (Tr. 245). X-rays of Plaintiff's right shoulder, taken the same day, were "normal" with "no evidence of bone, joint or other soft tissue abnormality." (Tr. 246).

On January 23, 2007, Plaintiff participated in an MRI examination of her right shoulder the results of which revealed:

> Normal marrow signal. No evidence of a Hill-Sachs deformity or osseous Bankart fracture. No evidence of a labral tear...no evidence of a tear of the tendons of the rotor cuff. No significant signal abnormality about the tendons. There is lateral downsloping of the acromion. While this morphology can be associated with impingement type symptoms, [there is] no evidence of underlying signal abnormality of the supraspinatus. The scapular notch appears

4

normal.

(Tr. 247).

On January 23, 2007, Plaintiff participated in an MRI examination of her lumbar spine the results of which revealed "mild lower lumbar degenerative changes without spinal stenosis, root compression or interval change evident." (Tr. 248).

On April 17, 2007, Plaintiff participated in a CT scan of her sinus passages the results of which were "essentially normal...with some minimal mucosal thickening at the left maxillary sinus floor." (Tr. 238).

On June 25, 2007, Plaintiff participated in a consultive examination conducted by Dr. Elaine Kountanis. (Tr. 351-54). Plaintiff reported that she was disabled due to injuries suffered in her December 2005 auto accident. (Tr. 351). Plaintiff reported that she experiences "continuing pain that is 24 hours/7 days a week." (Tr. 351). The doctor observed that Plaintiff was "fully cooperative with the exercises," but "was crying with pain after trying to lift the suitcase and bend forward at the waist." (Tr. 352). An examination of Plaintiff's back and pelvis revealed pain at the right SI joint, right lumbosacral spine, and the anterior pelvis. (Tr. 353). Plaintiff exhibited limited range of motion of the cervical spine, but the doctor observed that Plaintiff "read her weight on the portable floor scale without complaints of neck pain." (Tr. 353). The doctor also noted that when Plaintiff ambulated she "walked with no rotation of the spine especially in the thoracic region." (Tr. 353). The results of a neuromuscular examination were otherwise unremarkable with negative straight leg raising and negative Babinski test.[1] (Tr. 353). The doctor concluded that Plaintiff was

---

[1] Babinski test is a neurological test designed to discern damage to the central nervous system. *See* Babinski, available at http://www.medterms.com/script/main/art.asp?articlekey=7171 (last visited on August 8, 2012).

experiencing mechanical lower back pain. (Tr. 353). The doctor concluded that Plaintiff "would benefit from an intensive physical therapy and weight loss program." (Tr. 354). Plaintiff also reported that she was a "frequent flyer to the ER" to receive pain medication. (Tr. 351). Specifically, Plaintiff reported that she had reported to the emergency room to receive pain medication "50 times over the last year." (Tr. 351).

On July 13, 2007, Dr. John Pai completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations. (Tr. 381-94). Determining that Plaintiff suffered from a pain disorder, the doctor concluded that Plaintiff satisfied the Part A criteria for Section 12.07 (Somatoform Disorders) of the Listing of Impairments. (Tr. 382-90 ). The doctor determined, however, that Plaintiff failed to satisfy any of the Part B criteria for this particular Listing. (Tr. 391). Specifically, the doctor concluded that Plaintiff experienced mild restrictions in the activities of daily living, moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and never experienced extended episodes of decompensation. (Tr. 391).

Dr. Pai also completed a Mental Residual Functional Capacity Assessment form regarding Plaintiff's limitations in 20 separate categories encompassing (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation. (Tr. 377-79). Plaintiff's abilities were characterized as "moderately limited" in three categories. (Tr. 377-78). With respect to the remaining 17 categories, however, the doctor reported that Plaintiff was "not significantly limited." (Tr. 377-78).

On June 26, 2007, Plaintiff participated in a consultive examination conducted by Robert Griffith, Ph.D. (Tr. 359-63). Plaintiff reported that she was disabled due to injuries suffered

6

in her December 2005 auto accident.  (Tr. 359).  Plaintiff reported that she had reported to the

emergency room "50 times in the last year" to receive pain medication.  (Tr. 359).  The results of a

mental status examination were unremarkable.  (Tr. 361-62).  Plaintiff was diagnosed with a pain

disorder and her GAF score was rated as 58.[2]  (Tr. 363).

On February 26, 2008, Plaintiff was examined by Dr. Fayyaz Mahmood.  (Tr. 543-

45).  Plaintiff reported that "her whole body aches severely, especially in the upper and lower back"

and that "slight movement or mild palpation triggers excruciating pain."  (Tr. 543).  The results of

a physical examination revealed the following:

> No evidence of resting, intention, or postural tremors.   No
> fasciculations.  No focal muscle atrophy.  The muscle strength overall
> appeared normal but the patient's body participated less in the testing
> of the muscle strength because of the complaint of increasing pain
> upon moving the muscles or exerting.  Deep tendon reflexes were
> intact.  Babinski sign was negative bilaterally.  No subjective loss of
> sensation when tested for light touch, pinprick, cold sensation and
> vibration.  Normal coordinated movements of the extremities.  No
> dysmetria or past pointing on finger-nose-finger testing.  The
> patient sat without a tendency to fall to either side.  The patient stood up
> from the seated position with little difficulty, complaining of pain in
> multiple areas of the body.  She walked with normal gait features but
> her gait was conscious and trying not to cause more pain upon
> walking.  Supple [neck].  Normal cervical spine range of motion.

(Tr. 545).

On May 7, 2008, Plaintiff was examined by Dr. J.D. Wideman with the Kalamazoo

Center for Medical Studies.  (Tr. 497-99).  This was Plaintiff's initial visit to KCMS.  (Tr. 497).

Plaintiff reported that she was "not a good candidate" for physical therapy and instead requested

---

[2]  The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning.  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994) (hereinafter DSM-IV).  A GAF score of 58 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning."  DSM-IV at 34.

refills of numerous pain medications.  (Tr. 497).  The results of a musculoskeletal examination

revealed the following:

> Strength 5/5 biceps bilaterally.  Strength 5/5 triceps bilaterally.
> Strength 5/5 dorsiflexion feet bilaterally.  When asked to plantar flex,
> she begins crying and saying "no no no, I can't."  Has slight degree
> of muscular hypertonicity throughout paraspinal musculature.  When
> asked to flex/extend her lumbar and low thoracics, she cries and
> groans, but is able to flex/extend fairly well.  Difficult to appreciate
> any significant impairment in her ROM.

(Tr. 498).  Dr. Wideman declined to refill Plaintiff's prescriptions because he was unable to review

her previous medication records.  (Tr. 499).  The doctor also noted that he was "wary of prescribing

her current regimen, especially given her inconsistent examination findings."  (Tr. 499).

On September 24, 2008, Plaintiff was examined by Dr. Smitha Suravaram.  (Tr. 486-

87).  Plaintiff reported that she was experiencing neck, back, and shoulder pain which rated "10 out

of 10 in intensity."  (Tr. 486).  Plaintiff reported that she "is not able to do much" and "uses a cane

for walking."  (Tr. 486).  Plaintiff reported that she was taking OxyContin, Vicodin, Ultram, Flexeril,

and Valium to treat her pain.  (Tr. 486).  The doctor observed that Plaintiff discontinued seeing a

different doctor after "being accused of drug seeking behavior."  (Tr. 486).  Dr. Suravaram

recommended to Plaintiff that she obtain an x-ray of her cervical spine, but Plaintiff "refused."  (Tr.

486).  The doctor observed that "a CT scan of [Plaintiff's] spine was done last year which did not

show any acute disc herniation."  (Tr. 486).  An examination of Plaintiff's back revealed that

Plaintiff was "tender to palpation over her entire back," but "not tender to palpation at the paraspinal

muscles."  (Tr. 486).  Plaintiff "refused" to participate in a range of motion examination "because

of the excessive pain."  (Tr. 486-87).  Plaintiff accepted refills of pain medication, but "refused" to

participate in physical therapy as the doctor recommended.  (Tr. 487).

On April 3, 2009, Plaintiff was examined by Dr. Firas Gorges. (Tr. 531-32). Plaintiff requested pain medication, specifically Vicodin and Valium. (Tr. 531). The results of an examination revealed the following:

> The patient's affect is appropriate. She is conversing and responding to questions appropriately. However, at times during the encounter she was tearful and mildly anxious. When I shook her hand, the patient complained of neck pain when reaching for my hand. There is point tenderness over the upper neck down to the trapezius muscle. The patient became tearful when I lightly palpated her neck muscles. She had difficulty getting in and out of her jacket. She was not willing to get on the examination table. She refused to do so. While the patient was putting her jacket back on, she appeared to have decent range of motion of her upper extremities.

(Tr. 531).

On May 24, 2009, Plaintiff reported to the emergency room complaining of "intractable back pain." (Tr. 530). Plaintiff was "able to make it to building, but not able to make it INTO building without assistance." (Tr. 530). Plaintiff was, however, subsequently able to ambulate to the bathroom. (Tr. 530). Plaintiff refused to participate in a physical exam or any touching of her legs, back, or arms. (Tr. 530). The doctor recommended that Plaintiff participate in physical therapy "and focus on core-strengthening as [she] is terribly deconditioned." (Tr. 530).

On July 2, 2009, Plaintiff was examined by Dr. Zebi Naz. (Tr. 524-25). Plaintiff requested a refill of her pain medications and reported that she now must use a wheelchair when leaving her house. (Tr. 524). The doctor reported that Plaintiff was "uncooperative" during her examination. (Tr. 524). Specifically, the results of a musculoskeletal examination revealed the following:

> On focused examination of her neck she refused to get on the table. She was able to stand with the cane. She has point tenderness in her

> neck and paraspinal region as well as in the thoracolumbar region.
> She refused to further complete back exam and neck exam.  She
> refused to do range of motion.  Pulses are good in both upper and
> lower extremities.

(Tr. 524).  Plaintiff was administered a urine drug screen the results of which were "positive for

hydromorphone and morphine."  (Tr. 524).

On August 21, 2009, Plaintiff reported to Dr. Steven Kapetansky for what was

scheduled to be a "pap, pelvic [and] breast" examination.  (Tr. 571-72).  However, when the doctor

met with Plaintiff, she reported "that she does not want to have that done."  (Tr. 571).  Instead,

Plaintiff repeatedly requested narcotic pain medication ostensibly for her neck and back.  (Tr. 571).

On September 17, 2009, Plaintiff was examined by Dr. Kapetansky.  (Tr. 569-70).

Plaintiff reported that she was suffering "intractable" neck and back pain.  (Tr. 569).  Plaintiff

reported that she reported to the emergency room to receive a pain injection the previous evening

because "she had to."  (Tr. 569).  Plaintiff reported that "she has in the last few months began to try

to do more of activities of daily living herself including getting from bed to bathroom and bathing

and dressing."  (Tr. 569).  Plaintiff reported, however, that this increased level of activity "caused

new pain which was not helped by any of the medications."  (Tr. 569).  Plaintiff also reported that

she "was rejected by the pain clinic, because her pain was too intense to complete [their] therapies."

(Tr. 569).  The doctor observed that Plaintiff was "sweating profusely and is sitting very stiffly

unable to turn her neck to left or right."  (Tr. 569).  The doctor also reported that "palpation of the

vertebral bodies at C6 level makes her shout and jump."  (Tr. 569).  Plaintiff was also "unwilling to

let [the doctor] move her head left or right."  (Tr. 569).  The doctor also reported that he was "able

to passively distract [Plaintiff] into forward flexion to approximately 40% before she said the pain

10

shoots down into her low hips." (Tr. 570). When the doctor informed Plaintiff that he was unable to provide her with the pain medication she requested, Plaintiff became "very upset." (Tr. 570).

At the administrative hearing, Plaintiff testified that her back pain ranges from 7/10 to 10/10 and that approximately four days out of seven her pain is so "extreme" that she is unable to function. (Tr. 43-45). Plaintiff also reported that she experienced headaches that are 10/10 in severity. (Tr. 50). When the ALJ questioned Plaintiff about treatment records indicating that she had engaged in drug seeking behavior, Plaintiff responded that she had not abused her medications but that some unknown substance had been secretly placed into her Pepsi one night at a bar. (Tr. 60-63). Plaintiff reported that she experiences nausea "every day" and "actually" vomits "at least four days a week." (Tr. 63-64). Plaintiff reported that she was "essentially incapacitated from the nausea...every day." (Tr. 65). Plaintiff reported that she engages in no activities and even requires assistance bathing and dressing herself. (Tr. 66-67). Plaintiff reported that she was "willing to do any type of work" as long as she "could do it laying down." (Tr. 72).

## ANALYSIS OF THE ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[3] If the Commissioner can make a

---

[3] 1.  An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2.  An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3.  If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4.  If an individual is capable of performing work he or she has done in the past, a finding of "not disabled"

dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that Plaintiff suffered from: (1) a pain disorder; (2) degenerative disc disease status post back and hip fractures; (3) migraine headaches; (4) obesity; and (5) depression, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 17-19).

With respect to Plaintiff's residual functional capacity, the ALJ determined that

---

must be made (20 C.F.R. 404.1520(e));

5.  If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

Plaintiff retained the capacity to perform sedentary work subject to the following limitations: (1) during an 8-hour workday with normal breaks, she can sit for six hours and stand or walk for two hours; (2) she can occasionally climb ramps or stairs, but can never climb ladders, ropes, or scaffolds; (3) she can occasionally stoop and crouch; (4) she can frequently balance, kneel, and crawl; (5) she is limited to work that can be performed while using a hand-held device while standing; (6) she must avoid concentrated exposure to extreme heat, extreme cold, and excessive vibration; (7) she is limited to simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements; (8) she can only perform work which requires simple work-related decisions; (9) she can tolerate few, if any, workplace changes; (10) she can understand, remember, and carry out simple instructions; (11) she can respond appropriately to supervisors, co-workers, and usual work situations; and (12) she is able to deal with changes in a routine setting on a sustained basis.  (Tr. 19).

The ALJ determined that Plaintiff could not perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding.  *See Richardson*, 735 F.2d at 964.  While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added).  This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy.  *See Richardson*, 735 F.2d at 964.  Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a

significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Michelle Ross.

The vocational expert testified that there existed approximately 13,400 jobs in the state of Michigan which an individual with Plaintiff's RFC could perform, such limitations notwithstanding.  (Tr. 73-75).  This represents a significant number of jobs.  *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006).  The ALJ concluded, therefore, that Plaintiff was not entitled to benefits.

a.      The ALJ Properly Evaluated the Medical Evidence

The record contains a document titled, "Statement of Steven Kapetansky, M.D."  (Tr. 573-76).  The "statement" in question is actually a transcript of a purported September 25, 2009 deposition of Dr. Kapetansky conducted by Plaintiff's counsel.  Citing to this document, Plaintiff asserts that the ALJ failed to afford sufficient weight to the opinions expressed by Dr. Kapetansky.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and her maladies generally possess significant insight into her medical condition.  *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).  An ALJ must, therefore, "give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'"  *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004).

Such deference is appropriate, however, only where the particular opinion "is based

14

upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)).  The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so.  *Wilson*, 378 F.3d at 544.  In articulating such reasons, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors.  *See* 20 C.F.R. §§ 404.1527, 416.927; *see also*, *Wilson*, 378 F.3d at 544.  The ALJ is not required, however, to explicitly discuss each of these factors.  *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007).  Instead, the record must reflect that the ALJ considered those factors relevant to his assessment.  *See Oldham*, 509 F.3d at 1258; *Undheim*, 214 Fed. Appx. at 450.

First, because the "statement" in question is not signed or otherwise adopted by Dr. Kapetansky it has absolutely no evidentiary value.  Second, even if the Court accepts that the transcript in question accurately reflects Dr. Kapetansky's comments, the doctor offered no opinion during this exchange to which the ALJ was obligated to defer.  Rather than identify specific

15

functional limitations from which Plaintiff suffers, the doctor simply reiterated Plaintiff's subjective allegations, which as discussed below are not credible, and concluded that Plaintiff was unable to perform "full time sustained work."  However, Dr. Kapetansky's opinion that Plaintiff is disabled is entitled to no deference because the determination of disability is a matter left to the commissioner.  *See* 20 C.F.R. § 404.1527(e)(1).  Finally, despite these deficiencies in Dr. Kapetansky's "statement," the ALJ nevertheless considered such and accorded it limited weight as such was inconsistent with the evidence of record.  This determination is supported by substantial evidence as the medical record detailed above reveals.  The Court, therefore, discerns no error in the ALJ's evaluation of Dr. Kapetansky's opinion.

b.  The ALJ Improperly Discounted Plaintiff's Subjective Allegations

As described above, Plaintiff testified at the administrative hearing that she experiences "extreme" pain and limitation that prevent her from performing any work except that which can be performed "laying down."  Plaintiff asserts that the ALJ erred by failing to accord controlling weight to her subjective allegations.

As the Sixth Circuit has long recognized, "pain alone, if the result of a medical impairment, *may* be severe enough to constitute disability." *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984) (emphasis added); *see also*, *Grecol v. Halter*, 46 Fed. Appx. 773, 775 (6th Cir., Aug. 29, 2002) (same).  As the relevant Social Security regulations make clear, however, a claimant's "statements about [his] pain or other symptoms will not alone establish that [he is] disabled."  20 C.F.R. § 404.1529(a); *see also*, *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997) (quoting 20 C.F.R. § 404.1529(a)) *Hash v. Commissioner of Social Security*, 309 Fed.

16

Appx. 981, 989 (6th Cir., Feb. 10, 2009).  Instead, as the Sixth Circuit has established, a claimant's

assertions of disabling pain and limitation are evaluated pursuant to the following standard:

> First, we examine whether there is objective medical evidence of an
> underlying medical condition.  If there is, we then examine: (1)
> whether objective medical evidence confirms the severity of the
> alleged pain arising from the condition; or (2) whether the objectively
> established medical condition is of such a severity that it can
> reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531 (citations omitted).  This standard is often referred to as the *Duncan*

standard.  *See Workman v. Commissioner of Social Security*, 105 Fed. Appx. 794, 801 (6th Cir., July

29, 2004).

Accordingly, as the Sixth Circuit has repeatedly held, "subjective complaints may

support a finding of disability only where objective medical evidence confirms the severity of the

alleged symptoms."  *Id.* (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)).

However, where the objective medical evidence fails to confirm the severity of a claimant's

subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to

resolve the significant conflicts in the administrative record."  *Workman*, 105 Fed. Appx. at 801

(citing *Walters*, 127 F.3d at 531).

In this respect, it is recognized that the ALJ's credibility assessment "must be

accorded great weight and deference."  *Workman*, 105 Fed. Appx. at 801 (citing *Walters*, 127 F.3d

at 531); *see also*, *Heston v. Commissioner of Social Security*, 245 F.3d 528, 536 (6th Cir. 2001) ("[i]t

is for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the

witnesses and weigh and evaluate their testimony").  It is not for this Court to reevaluate such

evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must

stand.  The ALJ found Plaintiff's subjective allegations to not be fully credible, a finding that should

not be lightly disregarded.  *See Varley v. Sec'y of Health and Human Services*, 820 F.2d 777, 780

(6th Cir. 1987).

      The ALJ discounted Plaintiff's subjective allegations as such were "out of proportion

to both her impairments and the record of medical treatment."  (Tr. 21).  As the ALJ observed, the

objective medical evidence as well as the conservative treatment recommendations offered by

Plaintiff's care providers belies her allegations of "extreme" and disabling pain.  The record also

contains substantial evidence that Plaintiff often exaggerated the nature and extent of her pain and

engaged in drug seeking behavior.  In sum, the ALJ's decision to discount Plaintiff's subjective

allegations is supported by substantial evidence.  *See Norris v. Commissioner of Social Security*,

2012 WL 372986 at *4-5 (6th Cir., Feb. 7, 2012) (where the ALJ "did not misconstrue facts in the

record or overlook other significant evidence. . .and identified specific facts supported by the record"

which to "a reasonable mind" would "cast doubt on" a claimant's subjective allegations, the ALJ's

decision to discount the claimant's credibility is not in error).

      c.     Social Security Ruling 03-2p

      Plaintiff next argues that the ALJ "failed to follow" Social Security Ruling 03-2p.

This particular Ruling concerns how to evaluate disability claims asserted by claimants suffering

from Reflex Sympathetic Dystrophy Syndrome,[4] also known as Complex Regional Pain Syndrome.

---

[4]  Reflex Sympathetic Dystrophy (also known as Complex Regional Pain Syndrome) is a chronic neurological syndrome characterized by severe burning pain, pathological changes in bone and skin, excessive sweating, tissue swelling, and extreme sensitivity to touch.  *See* About CRPS, *available at*, http://www.rsds.org/2/what_is_rsd_crps/index.html (last visited on August 8, 2012).  The "key symptom" of this disorder is "continuous, intense pain out of proportion to the severity of the injury;" moreover, there is no cure for this disorder which "gets worse rather than better over time."  Complex Regional Pain Syndrome Information, *available at*,

*See* Titles II and XVI: Evaluating Cases Involving Reflex Sympathetic Dystrophy Syndrome/Complex Regional Pain Syndrome, SSR 03-2P, 2003 WL 22399117 (S.S.A., Oct. 20, 2003).  As Plaintiff has not been diagnosed with Reflex Sympathetic Dystrophy Syndrome or Complex Regional Pain Syndrome, the Court fails to discern how the ALJ's failure to consider this particular Social Security Ruling is relevant or in error.  This argument is, therefore, rejected.

           d.       Plaintiff has not Established that She Suffers from a Listed Impairment

The Listing of Impairments, detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1, identifies various impairments which, if present to the severity detailed therein, result in a finding that the claimant is disabled.  Plaintiff asserts that she is entitled to relief "because the ALJ erred as a matter of law by not stating his reasons for declining Plaintiff's claim under Listings 1.02 or 1.03." Section 1.02 of the Listing applies to:

> Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity. . .and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  With:
>
> A.      Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;[5]

---

http://www.ninds.nih.gov/disorders/reflex_sympathetic_dystrophy/reflex_sympathetic_dystrophy.htm (last visited on August 8, 2012).

[5]  The relevant regulation defines "inability to ambulate effectively" as "an extreme limitation of the ability to walk" caused by "an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities."  20 C.F.R., Part 404, Subpart P, Appendix 1 § 1.00(B)(2)(b).  Examples of ineffective ambulation include "the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail."  *Id.*

OR

B.    Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R., Part 404, Subpart P, Appendix 1 § 1.02.

Section 1.03 of the Listing concerns "Reconstructive surgery or surgical arthrodesis of a major weight- bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset." 20 C.F.R., Part 404, Subpart P, Appendix 1 § 1.03.

Plaintiff bears the burden of establishing that she satisfies the requirements of any listed impairment. *See, e.g.*, *Bingaman v. Commissioner of Social Security*, 186 Fed. Appx. 642, 645 (6th Cir., June 29, 2006). The evidence of record, as detailed above, belies any claim that Plaintiff satisfies Section 1.02 or Section 1.03 of the Listing of Impairments. The ALJ concluded that Plaintiff failed to carry her burden that she satisfied either Listing. This determination is supported by substantial evidence. Accordingly, this argument is rejected.

e.    Plaintiff is not Entitled to a Sentence Six Remand

Finally, Plaintiff asserts that she is entitled to a remand so that certain medical evidence, first submitted in this Court, can be considered by the Commissioner. As Plaintiff recognizes, this Court cannot consider any evidence that was not first presented to the ALJ. *See Cline v. Commissioner of Social Security*, 96 F.3d 146, 148 (6th Cir. 1996); *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007). If Plaintiff can demonstrate, however, that this evidence is new

20

and material, and that good cause existed for not presenting it in the prior proceeding, the Court can remand the case for further proceedings during which this new evidence can be considered. *Cline*, 96 F.3d at 148. To satisfy the materiality requirement, Plaintiff must show that there exists a reasonable probability that the Commissioner would have reached a different result if presented with the new evidence. *Sizemore v. Secretary of Health and Human Serv's*, 865 F.2d 709, 711 (6th Cir. 1988). Plaintiff bears the burden of making these showings. *See Hollon ex rel. Hollon v. Commissioner of Social Security*, 447 F.3d 477, 483 (6th Cir. 2006).

This additional evidence consists of a report by Dr. Kapetansky in which he asserts that Plaintiff is impaired to an extent significantly greater than that recognized by the ALJ. (Tr. 586-87). The opinions expressed in this report are not supported by the evidence. Moreover, this report is dated almost six months after the expiration of Plaintiff's insured status and the doctor did not indicate the date on which Plaintiff began suffering from the limitations articulated therein. This additional material also contains the transcript of a June 23, 2010 deposition of Dr. Kapetansky conducted by Plaintiff's counsel. (Tr. 578-84). In this exchange, Dr. Kapetansky acknowledged that he had not diagnosed Plaintiff with chronic pain syndrome. Also, the doctor again, based on Plaintiff's less than credible subjective allegations, concluded that Plaintiff is disabled. The bulk of the remaining evidence concerns Plaintiff's condition following the expiration of her insured status. In sum, it is not reasonable to assert that consideration of this material by the ALJ would have led to a different result. Accordingly, the Court is precluded from considering this evidence and, furthermore, there exists no basis for remanding this matter for its further consideration.

**CONCLUSION**

21

For the reasons articulated herein, the Court concludes that the ALJ's decision is supported by substantial evidence.  Accordingly, the Commissioner's decision is **affirmed**.  A judgment consistent with this opinion will enter.


Date:  September 7, 2012                              /s/ Ellen S. Carmody
                                                     ELLEN S. CARMODY
                                                     United States Magistrate Judge